Good morning. May it please the Court, I'm Charles Nickel for the Petitioners. This is a Fijian asylum case in which the applicant was found to be entirely credible. Ms. Ram suffered throughout her life under the Fijian system of apartheid, in which the rights of native Fijians are superior to the rights of Indo-Fijians, such as Ms. Ram. The Fijian Constitution specifies that the interests of native Fijians are paramount. Land ownership, government jobs, the police, the military are controlled by natives. The immigration judge stated that while she did not condone the native Fijians' mistreatment of Indo-Fijians, she found that the harm that Petitioners suffered in Fiji rose only to the level of discrimination and harassment. This Court has held that a member of a disfavored group within a country where there is a pattern and practice of persecution against that group needs to demonstrate a comparatively lower level of individualized risk in order to prove that he or she has a well-founded fear of persecution. The case I mentioned was Singh v. INS 94F 3rd, 1353, which was a Fijian case. The government in its brief also cited McGowan v. INS 184F 3rd at 1035. There are several cases that the Ninth Circuit has had that have made similar findings. A membership of a disfavored group must show, however, that he or she is likely to be viewed by the persecutor as a member of that group. So if Ms. Ram can demonstrate that there's a pattern and practice of persecution against a group of which she's a member, she's eligible for asylum. The more egregious the showing of group persecution and the greater the risk to all members of that group, the less evidence of individualized persecution would be required to establish the well-founded fear. Ms. Ram did establish that she's a member of a disfavored group, and she also established that she individually had a reasonable likelihood of being targeted by Indo-Fijians, I mean being targeted as an Indo-Fijian, because she had suffered persecution in the past. She's a third-generation Fijian, and her family were supporters of the Fijian Labor Party. She testified that in 1987 she'd attend Labor Party rallies, and the Native Fijians would attack the rallies, hitting them with sticks, while the police and other Native Fijians would stand by, and in some cases the police and soldiers would actually take part in the acts of persecution against Indo-Fijians. Following a government coup that same year by the Native-controlled Army, a group of 30 to 40 soldiers broke the doors and windows of Ms. Ram's home and then looted the house. Both of her parents-in-law were hospitalized due to the stress of the home invasion. Her husband was punched and kicked by the soldiers while she hid in a room with her infant children. The soldiers took everything of value in the house, and what they could not carry off they destroyed. For several months following the coup, soldiers or Native Fijians would enter the house without permission, take food, money, items they wanted. Ms. Ram and her children and her family had no protection from the police or from the Army, who were in fact often among the looters. Ms. Ram was asked at her hearing whether she continued to have problems after the coup, and she stated that, quote, the problems have always been present at all times. Whenever they feel like it, they come to the house. They beat you up. Anything they want to take, they take. It's best to remain quiet and let them take whatever they want. That's at administrative record 92. She testified to an incident in 1999, 12 years after the coup, when Native Fijians threw rocks at her home in an attempt to dilute her house. During the coup of 2000, when Ms. Ram was visiting her children in the U.S., her husband was beaten up by Native Fijians. The Fijian soldiers who were present joined in the beating and told him that Indians had no right to live in Fiji. Indian Fijians have very restricted access to owning property. He was evicted by his Native landlord. He suffered severe hardship and warned his wife against returning to Fiji due to the looting of homes and rapes of Indo-Fijian women, where the government was not holding the perpetrators accountable for their crimes. Ms. Ram had experienced persecution in the previous coup of 1987 when her home was looted and vandalized by Native Fijians who were joined in their criminal acts by Fijian soldiers. She suffered vandalism and crime from Fijians throughout her – from Native Fijians throughout her life. She – from her past experiences, she knew full well the situation she'd be returning to. And given the government's sanctioned discrimination against Indo-Fijians, the government's complicity in acts of persecution against Indo-Fijians, Ms. Ram would have no reason to believe that the Fijian authorities would provide her with any form of protection. Do you think that any woman who is Indo-Fijian and finds herself here is entitled to asylum, or she has family there that may be experiencing difficulty? I think that there has to be some showing. I don't know if you could go that far, because they do mention – and in saying they mention the worst cases of abuse, in that they mention – It had some pretty bad. Yeah. It mentioned – it mentioned that the most horrible reports on Indo-Fijians included women being raped in front of their children, political opponents brutally beaten, detainees forced to walk naked in the streets, and harm of children by being pressed against concrete. But I don't know that you could go so far as to say that any, you know, Indo-Fijian woman would be subject to rape. But in this case, we have an individual who throughout her life was subjected to harm by the Fijian authorities. She attempted to – she reported it. The reports were ignored. The government mentions that her husband remains in Fiji, but certainly not by his choosing. She testified that he attempted. Did he attempt to leave? Did he? Yeah. He attempted to – she mentioned in the – at the hearing that – where is it? It's AR-109, that he had attempted to go to Australia but had been denied a visa trying to get out of the country. I mean, it's an island and it's difficult for an entire family to get a visa because a consular officer is always looking at do you have a reason to come back. And, you know, if you're leaving your children there or you're leaving a husband or a spouse, they're more likely to give you a visa. But the fact that her – the fact that his wife is in the United States makes it very improbable that they would grant a visa under those circumstances. I just find that, you know, with the similarities between this case, the factual similarities and the legal issues between this case and Sing, that it's inconsistent to have a denial of asylum. And the same standard in Sing was also applied to applications for withholding and restriction on removal and withholding under the Torture Convention under the more recent case of Walkery v. Holder, 558 F. 3rd, 1049. So I think she would be eligible for those forms of relief as well. I have about a minute and a half. Should I reserve that? Thank you. Thank you. You may. Good morning. May it please the Court. My name is Ted Durant and I represent the United States. Substantial evidence supports the immigration judge's finding that Mrs. Ram did not experience harassment, nor did she demonstrate a well-founded fear of future persecution. Now, the immigration judge recounted the evidence in the case and to what Mrs. Ram testified to. No doubt the events in Fiji were horrible. The Fijian people treated her and her family quite horribly. It was repugnant. But the judge found that what she experienced may have been harassment, may have been discrimination, but did not rise to the level of persecution, which is an extreme subject. And there's a whole litany of cases, Fijian, Indo-Fijians from this Court, whether it be Sinha, which was after this case, or Kumar or Singh, which Petitioner mentions, and sort of a slope of the treatment that these Indo-Fijians have gone through. Let's assume for the moment that substantial evidence did support the finding of no past persecution. Then we turn to the question of whether or not there's a well-founded fear of future persecution. The argument seems to be in this case that even though you don't have the presumption, if you have a group that's disfavored, and there's no real question that this is a disfavored group, that you have less to prove. And Lu Long, which in an Indonesian case, but I think speaks to this issue, is you have to show some individualized risk to the person. So here we have, it looks so there's not past persecution within meeting the standard of past persecution, but some very, some horrible events. Coupled with the systematic discrimination, why isn't that enough to show a well-founded fear of future persecution under the disfavored group analysis? Sorry for the long question, but I wanted to get it all out there. Well, I've read the briefs and I've read the entire administrative record, and I don't believe the agency ever did a disfavored group analysis in this case. The immigration judge didn't. The board didn't, because that was never raised to the board in the appeal. Now, the Respondent's brief mentions it, and Petitioner's brief can be read to potentially raise that issue, but the word disfavored group or those seminal cases, whether it be Petitioner's appeal, that I could find. I'll accept that for the moment. If it applies, what's your response? If it does apply, Ms. Ram has determined she's a member of an Indo-Fijian group, but she has not demonstrated that she herself a particular risk. She has family members living back there in Fiji right now. She has three siblings and, from what I can count, nine nieces and nephews based on her The record does not demonstrate that any of them have any problems whatsoever. Her father came back to the United States and went back to Fiji on his own accord, and he still remains there. Her husband, who lives there now, the last time he spoke with her based on the record in 2005, he said, don't come back, and her testimony is, his testimony was, economic conditions are poor. What he didn't say at page 108, according to her testimony, was don't come back, we're getting, you know, severely abused. Now, the judge's finding that she had similarly situated relatives in Fiji is relevant, and that's backed up by the most recent country report from 2004, that not only, and that but those who did the coup and those who had committed those crimes are being tried. So it's a positive step for the Indo-Fijians. That is my response to you, Your Honor, my long-winded answer to that. But if we accept the fact that there was no past persecution based on Ms. Ram's actions, she didn't leave until 1999. She worked. She maintained a job for those 12 years in between the coup and coming to the United States. She sent her, one of her kids here, children here, I believe that was Rajiv, then brought him back, and then left Edwin in Fiji because, as she said, she would have missed him. Now, we all love our children, and that's a great, and that's understandable, but that's not the actions of someone who's being persecuted. When you go to well-founded fear, the similarly situated relatives, there's no, there's no evidence that they're being persecuted or even bothered based on the testimony, with the exception of her husband, who's had some run-ins. But that, the last time that we have any evidence from him is from 2000. It appears that the conditions have improved. In addition, the judge also noted that the police were willing to take investigations, even come out there and try to solve a, he was allegedly mugged in 2005, and that's also supported by the country report, the last one from 2004. So based on that, she has not demonstrated a well-founded fear of persecution. And certainly a contrary result is not compelled. It's a sympathetic case. She was treated poorly. The actions of the native Fijians were repugnant, but not enough for a solemn withholding her convention or relief on her convention against torture. If there are no further questions, this concludes my presentation. Thank you, Your Honor. I just wanted to note that the issue of, well, Singh v. INS was cited in the brief to the board where it's mentioned the Ninth Circuit has held that membership in a group which is routinely subjected to persecution may qualify the applicant for asylum on the basis of membership in a particular social group, inciting Singh v. INS. That case, the holding is entirely dealing with the issue of disfavored groups and how members of that group, if they can establish that they're members and the level of persecution which the group is subjected to, may have a lower level of, lower evidentiary burden. As far as the country report, that same report on page 130 of the administrative record mentions that tensions between ethnic Fijians and Indo-Fijians has been a longstanding problem. While the Constitution notes that the composition of state services at all levels must be based on principles reflecting the ethnic composition, it also specifies the paramountcy of Fijian interest as a protective principle. And it mentions land tenure system where 87 percent of the land still remains in the hands of native Fijians. And actually, since this report, there's been a subsequent coup, and it's now under military rule. So I don't see the argument for saying that there's been any improvement that would make it less likely that Ms. Ram would be persecuted if she were to return to Fiji today. Thank you. Thank you.
judges: Adelman, Schroeder, Thomas